**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

ALVIN DANIEL GARCIA,

      Plaintiff,

      vs.                                          Civ. No. 19-580 KK

ANDREW SAUL, Commissioner
of the Social Security Administration,

      Defendant.

## MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court on Plaintiff Alvin Daniel Garcia's Motion to Reverse and Remand for a Rehearing with Supporting Memorandum (Doc. 17) ("Motion"), filed October 28, 2019. In his Motion, Mr. Garcia seeks review of Defendant the Commissioner of the Social Security Administration's unfavorable decision on Mr. Garcia's claim for Title XVI supplemental security income ("SSI") under 42 U.S.C. §§ 405(g) and 1383(c)(3). (Doc. 17.) The Commissioner filed a response in opposition to the Motion on January 24, 2020, (Doc. 21), and Mr. Garcia filed a reply in support of it on March 12, 2020. (Doc. 24.) Having meticulously reviewed the entire record and the relevant law and being otherwise fully advised, the Court FINDS that Mr. Garcia's Motion is well taken and should be GRANTED.

## I. Introduction and Procedural History

Mr. Garcia is fifty-four years old, has a GED, and attended some community college. (AR 36-37, 229, 894[1]; Doc. 17 at 1.) He served in the United States Marine Corps from 1986 to 1990 and was honorably discharged. (AR 37, 303, 388, 888.) After several years on disability due to lymphoma, (AR 38, 893, 1338), he worked in construction from approximately 1996 to 2010,

---

[1] Citations to "AR" are to the Administrative Record lodged in this matter on August 30, 2019. (Doc. 15.)

when he broke his femur falling from a roof.[2]  (AR 37, 303, 389, 889, 1047-48, 1338.)  He has no record of any earnings after 1998, (AR 191-201), and has not worked since he applied for SSI on December 9, 2013.  (AR 53, 82-83, 92, 104.)

In his application, Mr. Garcia alleged a disability onset date of January 1, 2011 due to post-traumatic stress disorder ("PTSD") and anger issues. (AR 82, 92, 228.) The agency determined that Mr. Garcia was not disabled initially and on reconsideration.  (AR 82-90; AR 93-103.)  At Mr. Garcia's request, Administrative Law Judge ("ALJ") Ann Farris held a hearing in Albuquerque, New Mexico on September 1, 2016.  (AR 47-81, 121.)  Mr. Garcia, his wife Barbara Garcia, and impartial vocational expert ("VE") Pamela Bowman testified at the hearing, at which attorney Jonathan Woods appeared on Mr. Garcia's behalf.  (AR 47-81, 144, 161; Doc. 17 at 3.) The ALJ issued an unfavorable decision on January 17, 2017.  (AR 8-22.)

Mr. Garcia requested review by the Appeals Council on February 8, 2017. (AR 176.) The Appeals Council denied Mr. Garcia's request on November 29, 2017, (AR 1-4), making the ALJ's decision the final decision from which Mr. Garcia appealed to this Court on January 26, 2018. (AR 1180-81); *see Doyal v. Barnhart*, 331 F.3d 758, 759 (10th Cir. 2003).

On August 31, 2018, the Commissioner filed an unopposed motion to reverse and remand, having "determined that a remand for further proceedings is warranted."  (AR 1187-88.)  The Court granted the Commissioner's motion the same day it was filed.  (AR 1182-83.)  On October 1, 2018, the Appeals Council remanded the case to the ALJ because the residual functional capacity ("RFC") she had assigned to Mr. Garcia "did not include any limitations on [Mr. Garcia's] ability to relate to supervisors despite the [ALJ] giving weight to medical source opinions

---

[2] Examining psychiatrist Paula Hughson, M.D., recorded that Mr. Garcia fell and broke his femur in 2007.  (AR 303.) However, Mr. Garcia's medical records regarding the injury show that it occurred in 2010, which is consistent with his reports to other mental health professionals.  (AR 38, 389, 889, 1047-48, 1338.)

indicating that [Mr. Garcia] had limitations in this area of mental functioning."[3] (AR 1192.) The Appeals Council ordered that, on remand, the ALJ should obtain additional evidence regarding Mr. Garcia's impairments, give further consideration to the medical source opinions in the record, further evaluate Mr. Garcia's mental impairments, give further consideration to his RFC, obtain supplemental evidence from a VE if warranted, and offer Mr. Garcia another hearing. (AR 1193.)

Pursuant to the Appeals Council's order, ALJ Farris held a second hearing in Albuquerque, New Mexico on April 4, 2019. (AR 1125-49.) Mr. Garcia and impartial VE Mary Diane Weber testified at the hearing, at which attorney Laura Johnson appeared on Mr. Garcia's behalf. (AR 1125-49, 1285.) At the hearing, Mr. Garcia amended his alleged onset date to December 9, 2013. (AR 1129.) On April 22, 2019, ALJ Farris again issued a decision unfavorable to Mr. Garcia. (AR 1103-19.) By regulation, Mr. Garcia is entitled to judicial review of this decision. *See* 20 C.F.R. 422.210(a) (claimant may obtain judicial review of "reconsidered determination").

## II. <u>Applicable Law</u>

### A.    Standard of Review

Judicial review of the Commissioner's denial of disability benefits is limited to whether the Commissioner's decision is supported by substantial evidence and whether the Commissioner applied the correct legal standards to evaluate the evidence. 42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004). "The failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (alteration and quotation marks omitted). In making these determinations, the Court must

---

[3] In her January 17, 2017 decision, ALJ Farris found that Mr. Garcia had the RFC to "perform a full range of work at all exertional levels but with the following nonexertional limitations: he must avoid exposure to loud noise levels; and can make simple work related decisions with few workplace changes. He should have no interaction with the general public and only occasional and superficial interactions with co-workers." (AR 16.)

meticulously examine the entire record but may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007); *Hackett v. Barnhart*, 395 F.3d 1168, 1172 (10th Cir. 2005). In other words, the Court may not reexamine the issues *de novo*. *Sisco v. U.S. Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993). The Court will not disturb the Commissioner's decision if it correctly applies legal standards and is based on substantial evidence in the record.

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004). Substantial evidence is "more than a scintilla, but less than a preponderance." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). "A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley,* 373 F.3d at 1118, or "constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992). The Court's examination of the record as a whole must include "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005).

**B.      Consideration and Evaluation of Evidence**

The ALJ must consider "all relevant evidence in the case record" in making a disability determination. SSR 06-03P, 2006 WL 2329939, at *4 (Aug. 9, 2006).[4] Although an ALJ is not required to discuss every piece of evidence, "[t]he record must demonstrate that the ALJ considered all of the evidence[.]" *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). The ALJ must discuss not only the evidence supporting her decision but also "the uncontroverted

---

[4] Certain Social Security Rulings that the Court relies on in its analysis, including SSR 06-03P, have been rescinded for claims filed on or after March 27, 2017. *See* SSR 96-2P, 2017 WL 3928298, at *1 (Mar. 27, 2017). However, Mr. Garcia filed his claim for SSI in 2013, and thus the rescinded rulings and case law interpreting them still apply.

evidence [s]he chooses not to rely upon, as well as significantly probative evidence [s]he rejects." *Id.* at 1010. The ALJ's decision must demonstrate application of the correct legal standards applicable to different types of evidence, and failure to follow the "specific rules of law that must be followed in weighing particular types of evidence in disability cases . . . constitutes reversible error." *Reyes v. Bowen*, 845 F.2d 242, 244 (10th Cir. 1988).

### III.   Mr. Garcia's Mental Health History[5]

#### A.      Mental Health Records

Mr. Garcia saw Bryan Krumm, C.N.P., on five occasions between July 2012 and March 2014 for medication management, cognitive behavioral therapy, and renewal of his state medical cannabis card.  (AR 294-98.)  At Mr. Garcia's March 2014 visit, the first after his amended alleged onset date, Mr. Krumm indicated that Mr. Garcia's depression, anxiety, and irritability "continue[d]" but were "manageable," and described his mood as "more stable," his "sleep/rest," "concentration/focus," grooming, and hygiene as "adequate," his demeanor as "cooperative" and "calm," and his mood as "euthymic."  (AR 294.)  He recorded that Mr. Garcia was "[w]riting music more" and had continued homicidal ideation but "will not act, contracts safety."  (AR 294.)  Mr. Krumm diagnosed Mr. Garcia with PTSD, mood disorder, and persistent disorder of initiating or maintaining sleep, noted that Mr. Garcia benefited significantly from using medical cannabis, and recommended renewal of Mr. Garcia's card at his next visit.  (AR 294.)

Paula Hughson, M.D., conducted a consultative psychiatric examination of Mr. Garcia on May 8, 2014.  (AR 300-06.)  Dr. Hughson took a clinical history, reviewed Mr. Krumm's March 2014 note, and performed a mental status examination of Mr. Garcia.  (AR 302-06.)  She noted his

---

[5] In his Motion, Mr. Garcia makes no arguments regarding his physical impairments.  (*See generally* Doc. 17.)  As such, though it has reviewed the entire record, the Court will limit its discussion to the record evidence regarding Mr. Garcia's mental impairments.

"[s]lightly elevated" psychomotor activity, "[f]ast pressured speech," and "[p]olite, cooperative" attitude.  (AR 302.)  According to Dr. Hughson, Mr. Garcia reported that he sleeps six to eight hours per night but has nightmares "about every other night," is "angry all the time," "sometimes paranoid," "anxious and hypervigilant around police and gang members," "generally hypervigilant in crowds," and "a conspiracy theorist."  (AR 303.)  She further recorded that he reported "a big problem with authority" and "road rage leading to homicidal thoughts," and that he "[m]ostly stays home."[6]  (AR 303.)

With respect to Mr. Garcia's "current functioning," Dr. Hughson noted that he "[p]lays the guitar for about three hours," plays in a band, walks his dogs, "[d]oes light house maintenance," and uses the Internet.[7]  (AR 304.)  She reported that Mr. Garcia's mental status examination was normal except for an "[i]rritated" mood, "[n]ot infrequent" homicidal ideation, and "[l]imited" insight.  (AR 304-05.)  She diagnosed Mr. Garcia with PTSD, alcohol dependence in full, sustained remission, and cannabis dependence.  (AR 305.)  With respect to his "[u]ntreated PTSD," she observed that he had "[w]itnessed domestic violence" and experienced combat, is a cancer survivor, and fractured his femur falling from a roof while working in construction.  (AR 305.)  Dr. Hughson recorded that Mr. Garcia "[g]ot along well with coworkers"; however, she also noted that the roof fall "ended his ability to work in construction" and concluded that his presentation was "significant for his inability to resume functioning" afterward.  (AR 304-05.)  Dr. Hughson assessed Mr. Garcia's symptoms and impairment to be "moderate" but his "rehabilitation needs"

---

[6] Dr. Hughson elaborated that Mr. Garcia "[s]trategizes how he would kill the people involved when he is confronted with police, for example at road blocks.  [He f]eels that he is unable to work because of his problem with authority.  [He d]oesn't like being told what to do."  (AR 303.)

[7] Dr. Hughson wrote that Mr. Garcia "[l]ives alone."  (AR 302.)  However, overwhelming record evidence—including other portions of Dr. Hughson's report—clearly indicates that, in fact, he is married and lives with his wife, whom he described as his "caregiver."  (*See, e.g.*, AR 37, 39, 55-56, 66, 69, 74, 209, 219, 242, 256, 258-59, 302, 304, 894, 904-05, 1133, 1137, 1337, 1384, 1387.)

to be "complex" because "his fairly rigid ways of thinking would present a considerable impediment to treatment."  (AR 305.)

Mr. Garcia saw Ana Kuny, Ph.D., at the New Mexico Veterans Administration Health Care System ("VA HCS") on September 29, 2014.  (AR 904-06.)  Based on his reports and her findings, Dr. Kuny listed Mr. Garcia's diagnoses as "PTSD (provisional)" and moderate, recurrent major depressive disorder.  (AR 905.)  She referred him for evaluation and treatment and placed him on a waiting list for anger management education.  (AR 905.)

On November 13, 2014, psychology intern Heidi Labash, supervised by Catherine Hearne, Ph.D., conducted a Mental Health Assessment of Mr. Garcia at the VA HCS.  (AR 888-97.)  Ms. Labash identified Mr. Garcia's "index trauma" as a 1988 helicopter explosion that Mr. Garcia witnessed and from which he helped to retrieve the remains of fellow Marines.  (AR 888, 892.)  Ms. Labash recorded the following symptoms:  (1) recurrent and intrusive recollections of the traumatic event; (2) recurrent distressing dreams of the event; (3) psychological distress at exposure to reminders; (4) physiological reactivity on exposure to reminders; (5) avoidance of thoughts, feelings, or conversations about the event; (6) psychogenic amnesia; (7) persistent negative beliefs; (8) persistent negative emotional state of survivor's guilt; (9) irritability or outbursts of anger; (10) hypervigilance; (11) exaggerated startle response and avoidance of situations likely to trigger it; (12) difficulty concentrating; and, (13) difficulty sleeping.  (AR 892-93.)  However, Ms. Labash noted that Mr. Garcia "continues to play music by himself and with his bands, hang out with his wife and take his three dogs for walks."  (AR 893.)  Ms. Labash diagnosed Mr. Garcia with PTSD, and with alcohol and stimulant use disorders in sustained remission.  (AR 897.)

Mr. Garcia participated in a nine-session Anger Management Class with Eric Levensky, Ph.D., and Dr. Kuny through the VA HCS from November 13, 2014 to January 22, 2015.  (AR 661-70, 887-88.)  Records from these sessions reflect that Mr. Garcia was an active participant who appeared to benefit from the class.  (AR 661-70, 887-88.)

Also through the VA HCS, Mr. Garcia participated in a study to compare the effectiveness of two therapeutic modalities for treating PTSD.  (AR 661.)  As part of this study, from March 5, 2015 to June 23, 2015, Mr. Garcia participated in fourteen Cognitive Processing Therapy ("CPT") sessions with social worker Mark Godwin.  (AR 629-60.)  At the conclusion of these sessions, Mr. Godwin reported that Mr. Garcia's "PCL-5 scores took a significant drop in sessions 12 and 13 going up midway again in session 14."[8]  (AR 639.)  Per Mr. Godwin, Mr. Garcia reported "significant real life improvements from the therapy."  (AR 639.)  At a December 10, 2015 post-treatment follow-up appointment, Mr. Garcia reported "doing very well because of how Mr. Godwin taught him to deal with his symptoms."  (AR 630.)  At this appointment, "Mr. Garcia was referred to his treating therapist for further mental health follow-up."  (AR 630.)

Mr. Garcia saw Mr. Krumm again on September 1, 2016 for medication management, PTSD, and the state medical cannabis program.  (AR 320-21.)  Mr. Krumm noted Mr. Garcia's "[s]ignificant symptoms of PTSD related to history [of] severe trauma" and "[s]ignificant benefit with cannabis in all symptom clusters of PTSD"; the PTSD symptoms he noted included re-experiencing, arousal, numbing, avoidance, intrusive/negative thoughts, nightmares, anxiety, poor sleep, irritability, anger, depression, forgetfulness, distraction, and homicidal ideation.  (AR 320.)  Mr. Krumm recommended medical cannabis for Mr. Garcia as needed.  (AR 321.)

---

[8] The Post-Traumatic Stress Disorder Checklist for DSM-5, or PCL-5, "is a 20-item self-report measure that assesses the 20 *DSM-5* symptoms of PTSD. The PCL-5 has a variety of purposes," including "[m]onitoring symptom change during and after treatment," "[s]creening individuals for PTSD," and "[m]aking a provisional PTSD diagnosis[.]" https://www.ptsd.va.gov/professional/assessment/adult-sr/ptsd-checklist.asp (last visited June 5, 2020).

Eligio Padilla, Ph.D., evaluated Mr. Garcia on June 19, 2017.[9] (AR 36.)  At this evaluation, Dr. Padilla administered the Mini-Mental Status Exam ("MMSE"), the Post-Traumatic Stress Disorder Checklist-Civilian Version ("PCL-C")[10], the Beck Depression Inventory ("BDI-II"), the Wechsler Adult Intelligence Scale ("WAIS-IV"), and a mental status examination.  (AR 36.)  Dr. Padilla also reviewed physical and mental health records from Presbyterian Health Care Services, Dr. Hughson, Mr. Krumm, and the VA HCS, as well as Mr. Garcia's September 2014 Adult Function Report.  (AR 36.)

Dr. Padilla reported that Mr. Garcia's PLC-C score was consistent with PTSD, and his BDI-II score with severe major depression.  (AR 38.)  He assessed Mr. Garcia as having impaired judgment and decision-making, limited insight, dysphoric mood, loud and mildly pressured speech, and intrusive, disturbing thought content.  (AR 40.)  He noted Mr. Garcia's report that he has suicidal thoughts a couple of times a month, is "easily angered, and will sometimes fantasize about how he would use his Marine Corps training to murder rude people."  (AR 38.)  He found Mr. Garcia to be preoccupied with "problems with authority" and that "to avoid potential conflict he stays home almost all of the time."  (AR 40.)

With respect to Mr. Garcia's daily activities, Dr. Padilla recorded that Mr. Garcia rehearses with a heavy metal band once a week and performs six to eight times per year.  (AR 39.)  He noted Mr. Garcia's preference for "solitary activities" such as exercising, practicing guitar, playing video games, and surfing the Internet.  (AR 39.)  Dr. Padilla stated that Mr. Garcia's efforts at treatment

---

[9] Page seven of Dr. Padilla's report from this evaluation is missing from all three copies of the report in the Administrative Record.  (*See* AR 41-42, 1305-06, 1314-15.)

[10] "The PCL is a standardized self-report rating scale for PTSD comprising 17 items that correspond to the key symptoms of PTSD. . . .  1) PCL-M is specific to PTSD caused by military experiences and 2) PCL-C is applied generally to any traumatic event."  www.mirecc.va.gov › docs › visn6 › 3_PTSD_CheckList_and_Scoring (last visited June 5, 2020).

for his PTSD had been "infrequent and inconsistent." (AR 39.) He diagnosed Mr. Garcia with chronic PTSD and severe, recurrent major depressive disorder without psychotic features, and recommended that Mr. Garcia consider returning to the VA for "intensive care" knowing "that addressing his PTSD and depression will take a lot of time." (AR 43.) Dr. Padilla also recommended that Mr. Garcia try Prazosin for his nightmares. (AR 43.)

Mr. Garcia saw Monica Horstmann, Ph.D., for a VA Compensation and Pension evaluation on May 11, 2018. (AR 1332.) Dr. Horstmann reviewed Mr. Garcia's VA medical and mental health records, took a clinical history, evaluated his symptoms according to PTSD diagnostic criteria, made behavioral observations, and administered the PCL-5 to Mr. Garcia. (AR 1332-49.)

Mr. Garcia told Dr. Horstmann that, on a usual day, he did yard work, used the Internet, played video games, and practiced bass guitar. (AR 1337.) He reported that he "gets together with some guys in a band about once a month" and has a close friend with whom he talks daily. (AR 1337.) According to Dr. Horstmann, Mr. Garcia described two panic attacks, the last one a year earlier in a hardware store and the last "full" one in 2005. (AR 1341.) Mr. Garcia explained that he "can't handle crowds," if he sees a line he "just leave[s]," and he does not work because if he has a panic attack he needs to leave immediately. (AR 1343-44.) Dr. Horstmann noted Mr. Garcia's report that falling from a roof in 2010 "was a trauma," and that the helicopter explosion made him "anti-authority." (AR 1343.) She stated that when he worked for a temp agency before the fall, he "didn't get along with people" but "worked by himself" and "was able to be professional and provide services." (AR 1338.) In her report, Dr. Horstmann noted that Mr. Garcia described hypomanic/manic symptoms not previously reported to other providers. (AR 1342.) Mr. Garcia also described suicide attempts not documented elsewhere. (AR 1342.)

Dr. Horstmann noted the following symptoms related to Mr. Garcia's mental health diagnosis: depressed mood; anxiety; suspiciousness; panic attacks that occur weekly or less often; chronic sleep impairment; mild memory loss; disturbances of motivation and mood; difficulty in establishing and maintaining effective work and social relationships; difficulty in adapting to stressful circumstances, including work or a work-like setting; and, "[i]mpaired impulse control, such as unprovoked irritability with periods of violence." (AR 1346-47.) Dr. Horstmann observed that Mr. Garcia was cooperative and appeared euthymic but said he was anxious. (AR 1347.) She found his insight to be good, his judgment adequate, and his memory and concentration within normal limits, and reported "no gross evidence of delusional thoughts" though he did relay "beliefs related to conspiracy." (AR 1347.) On the PCL-5, Mr. Garcia scored a 54, which equates to "severe symptoms reported." (AR 1348.) Dr. Horstmann diagnosed Mr. Garcia with PTSD and stated that his "[s]ymptom severity is considered moderate." (AR 1332.)

Finally, Dr. Padilla conducted a second psychological evaluation of Mr. Garcia on March 6, 2019. (AR 1382.) On this occasion, Dr. Padilla interviewed Mr. Garcia, re-administered the MMSE, PCL-C, BDI-II, WAIS-IV, and a mental status examination, and reviewed records from Presbyterian Health Care Services, Dr. Hughson, Dr. Kuny, Elena Fisher, R.N., Mr. Krumm, Dr. Levensky, Mr. Godwin, Ms. Labash, and Dr. Hearne. (AR 1382-83.) He also reviewed Mr. Garcia's September 2014 Adult Function Report. (AR 1383.)

In his 2019 report, Dr. Padilla noted that Mr. Garcia's reported history was "consistent with what he [had] shared" in 2017. (AR 1383.) He added that, when Mr. Garcia was injured in 2010, "his psychiatric symptoms worsened to the point that he was unable to engage in gainful employment, or even part-time work." (AR 1392.) Dr. Padilla noted many of the same reported symptoms he had previously noted in 2017, including problems with authority, anger, homicidal

and suicidal thoughts, a BDI-II score that was "a bit lower" but "still suggest[ive of] severe major depression," and "social withdrawal and isolation as the primary way of coping with . . . stressors." (AR 1386, 1388, 1391.)  Dr. Padilla further reported that, "[w]hen he feels irritable which is almost all the time," Mr. Garcia "has major difficulty focusing his attention" and "his ability to concentrate is disrupted by intrusive, disturbing thoughts, anger and aggressive impulses."  (AR 1386, 1391.)

According to Dr. Padilla, Mr. Garcia "enjoys rehearsing with his friends once a week" and performing with a band six to eight times per year but can only tolerate "a couple of hours of performing" at a time.  (AR 1387.)  He noted that Mr. Garcia is "highly anxious while driving" and spends much of his day at the computer, getting up frequently to stretch and "because intrusive, disturbing thoughts disrupt his concentration."  (AR 1386-87.)  Dr. Padilla described Mr. Garcia's "efforts at treatment for his PTSD" as "inconsistent and not particularly effective."  (AR 1387.)

Dr. Padilla recorded that Mr. Garcia's results on the MMSE denoted "normal cognitive functioning."  (AR 1387.)  He characterized Mr. Garcia's attention, concentration, and memory as "grossly intact."  (AR 1387-88.)  However, he assessed Mr. Garcia's judgment and decision-making as "impaired" and his insight as "limited."  (AR 1388.)  Dr. Padilla found Mr. Garcia's attitude to be cooperative, his mood dysphoric, his speech "mildly pressured and loud," and his thought content "intrusive" and "disturbing."  (AR 1388.)  He also found Mr. Garcia to be preoccupied with "problems with authority."  (AR 1388.)

Dr. Padilla determined Mr. Garcia's WAIS-IV results to be reliable and reported that, based on these results, Mr. Garcia was "functioning cognitively in the average range of intellectual abilities," with a full-scale IQ of 99.  (AR 1388-89.)  *Inter alia*, Dr. Padilla reported that Mr. Garcia's "[v]erbal [c]omprehension" was in the high average range and his "[w]orking [m]emory,"

12

*i.e.*, his "ability to sustain attention, concentrate, and exert mental control," was in the average range.  (AR 1389-90.)  Dr. Padilla diagnosed Mr. Garcia with chronic PTSD and recurrent, severe major depressive disorder without psychotic features.  (AR 1390.)  He recommended that Mr. Garcia "seriously consider" inpatient treatment from the VA "which might take six months or more," as well as Prazosin for his nightmares.  (AR 1391.)

**B.**     **Function Reports**

Mr. Garcia completed an Adult Function Report on March 25, 2014.  (AR 209.)  In it, he indicated that he walks, feeds, and cleans up waste from his dogs.  (AR 209-11.)  He stated that he "can't sleep," but shops and is able to handle money.  (AR 210, 212.)  He reported playing music "once a month" with others.  (AR 213.)  According to Mr. Garcia in this report, he is "distracted" and can only pay attention for ten minutes at a time.  (AR 214.)  He stated that he does not get along well with authority figures but is "OK" at following written and spoken instructions and handling stress and changes in routine.  (AR 214-15.)

Mr. Garcia completed another Adult Function Report on September 9, 2014.  (AR 256-63.) It is broadly consistent with his earlier report.  (*Compare* AR 209-16 *with* AR 256-63.)  However, in this report, he indicated that he does yard work three times a week but cannot handle money. (AR 258-59.)  He further reported that his mental health condition affects his memory and concentration and his ability to complete tasks, understand, and get along with others, and that he can only pay attention for five minutes at a time.  (AR 261.)

Mr. Garcia's wife completed a Third-Party Adult Function Report on March 31, 2014.  (AR 219.)  In it, she indicated that Mr. Garcia spends "most of the day" on a computer in the garage. (AR 219.)  She stated that she provides "most of the care" for the couple's dogs, though Mr. Garcia does pick up their waste and also pulls weeds and keeps the bathroom clean.  (AR 220-21.)

According to Ms. Garcia, "there are times when [Mr. Garcia] goes a week or longer without a shower." (AR 220.) She stated that he does not shop and has no concept of money. (AR 222.) Ms. Garcia indicated that Mr. Garcia plays music and online video games every day. (AR 223.) She stated that he does not finish what he starts, follows written and spoken instructions poorly, and does not get along with authority figures or handle stress. (AR 224-25.) In her report, Ms. Garcia wrote that Mr. Garcia "has a problem with anyone that does not agree with him," thinks about killing people, is aggressive and "very hard to get along with," and "scares" her. (AR 226.)

Ms. Garcia completed another Third-Party Adult Function Report on September 6, 2014. (AR 242.) It is broadly consistent with her earlier report. (*Compare* AR 219-26 *with* 242-49.) In addition, she referred to Mr. Garcia's "constant ranting about world issues," (AR 242), his interrupted sleep, (AR 243), and his irritation due to changes in routine. (AR 248.) She further indicated that Mr. Garcia "is a liar" who "makes things seem better than what they are" and "always talks about how to kill" authority figures. (AR 246-48.)

## C.     Hearing Testimony

At the September 2016 hearing before ALJ Farris, Mr. Garcia testified that he had not performed in a band in about three years and was no longer writing music because he could not stay focused. (AR 53.) He stated that he could not tolerate being around more than five people or interact with others except in "controlled situation[s]." (AR 54, 60-61.) He further stated that he was going to counseling and anger management weekly and using medical cannabis to treat his PTSD. (AR 54, 57-58.) Mr. Garcia testified that he could drive but his wife did the shopping and paid the bills. (AR 55.) He reported PTSD symptoms of irritability, anxiety, anger, and overreaction to loud noises. (AR 60.) He said that he "react[s] very badly to advice" but denied "outbursts." (AR 62.) He explained that cannabis is the only medication he takes for his

psychiatric symptoms because he has cirrhosis and is a non-Hodgkin's lymphoma survivor and does not want to further damage his liver.  (AR 62; *see also, e.g.,* AR 328 (February 2016 liver scan identifying "morphologically cirrhotic liver with significant hepatocellular dysfunction").) He attributed his PTSD to witnessing and retrieving the remains of fellow Marines from a helicopter crash in 1989, falling from a roof in 2010, and childhood abuse.  (AR 63-64.)  Mr. Garcia described spending most of a typical day on the Internet, with "a couple hours" of bass guitar practice.  (AR 59.)  He admitted to sometimes emotionally abusing his wife.  (AR 65.)

Mr. Garcia's wife also testified at the September 1, 2016 hearing.  Ms. Garcia testified that Mr. Garcia "spends all his time in the garage" and that she does not interact with him when he is there.  (AR 69.)  She stated that he has "road rage" and she will not ride with him anymore.  (AR 70.)  She characterized Mr. Garcia as explosively angry, paranoid, emotionally abusive, and "very set in his ways," and said that he does not like to be criticized or told how to do something or to be around people.  (AR 70-73.)

Mr. Garcia's testimony at the April 2019 hearing was broadly consistent with his testimony at the September 2016 hearing.  (AR 1130-45.)  At the hearing, the ALJ inquired about the inconsistency between Mr. Garcia's lack of reported income after 1998 and his fall from a roof while working in 2010.  (AR 1130-31.)  Mr. Garcia responded that he had not worked since 1998 but was trying to go back to work when he fell.  (AR 1131.)  He further testified that he never got paid when his band "play[ed] out."  (AR 1131.)  He indicated that he had received no mental health treatment in the last two years.  (AR 1132.)  He stated that he spends "[s]ometimes four or five hours" playing music and "the other time" doing push-ups, bends and thrusts, and jumping jacks, and lifting weights.  (AR 1134.)  He testified that he cannot be in crowds but can "play gigs" with his band six to eight times per year for no more than two hours.  (AR 1134, 1143.)  According to

15

Mr. Garcia, he felt that Dr. Hughson was rude for not shaking his hand so he pretended he was okay when he was actually furious.  (AR 1140.)  He stated that he gets panicked once or twice a day most of the time and feels he has to escape three or four times a week.  (AR 1142.)  He estimated that he can concentrate for thirty minutes before he gets distracted.  (AR 1143.)

## D.     Functional Assessments

### Paula Hughson, M.D.

On May 8, 2014, Dr. Hughson opined that Mr. Garcia was moderately impaired in the abilities to:  (1) interact with the public; (2) interact with coworkers; (3) interact with supervisors; and, (4) adapt to changes in the workplace.[11]  (AR 300.)  Dr. Hughson further opined that Mr. Garcia was mildly impaired in the abilities to:  (1) understand and remember detailed or complex instructions; (2) attend and concentrate; and, (3) use public transportation or travel to unfamiliar places.  (AR 300.)

### Julian Lev, Ph.D. and Alvin Smith, Ph.D.

On May 16, 2014, Dr. Lev, a non-examining state agency psychological consultant, opined that Mr. Garcia was moderately limited in the abilities to:  (1) interact appropriately with the general public; (2) accept instructions and respond appropriately to criticism from supervisors; and, (3) get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  (AR 87-88.)  He limited Mr. Garcia to "simple, but not complex tasks in a normal work environment that requires no more than limited contact with other people."  (AR 88.)  On September 26, 2014, Dr. Smith, another non-examining state agency psychological consultant, reiterated Dr. Lev's opinions verbatim.  (AR 100-01.)

### Eligio Padilla, Ph.D.

---

[11] She also found him to be moderately impaired physically in his ability to carry out instructions.  (AR 300.)

On July 10, 2017, on a pre-printed form, Dr. Padilla opined that Mr. Garcia was markedly limited in the abilities to: (1) sustain an ordinary routine without special supervision; (2) work in coordination with or proximity to others without being distracted by them; (3) complete a normal workday and workweek without interruptions from psychological symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; (4) interact appropriately with the general public; (5) accept instructions and respond appropriately to criticism from supervisors; (6) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and, (7) respond appropriately to changes in the workplace. (AR 44-45.)

Dr. Padilla further opined that Mr. Garcia was moderately limited in the abilities to: (1) understand, remember, and carry out detailed instructions; (2) maintain attention and concentration for two-hour segments; (3) perform activities within a schedule, maintain regular attendance and be punctual within customary tolerance; (4) maintain socially appropriate behavior; and, (5) set realistic goals or make plans independently of others. (AR 44-45.)

Finally, Dr. Padilla assessed that Mr. Garcia was slightly limited in the abilities to: (1) remember locations and work-like procedures; (2) understand, remember, and carry out very short and simple instructions; (3) make simple work-related decisions; (4) ask simple questions or request assistance; (5) be aware of normal hazards and take adequate precautions; and, (6) travel in unfamiliar places or use public transportation. (AR 44-45.)

In his 2017 narrative report, Dr. Padilla restated his opinions regarding Mr. Garcia's impairments by category as follows:

> Mr. Garcia's ability to understand and remember basic instructions is mildly impaired; . . . his ability to understand and remember more complex, multistep instructions is mildly to moderately impaired; . . . his ability to concentrate and persist at tasks of basic work is moderately impaired; . . . his ability to interact with the general public, coworkers and supervisors is markedly impaired; and . . . his ability to adapt to changes in the workplace is markedly impaired.

17

(AR 43.)

Finally, on March 18, 2019 on a pre-printed form, Dr. Padilla assessed Mr. Garcia to be markedly limited in the abilities to:  (1) understand, remember, and carry out detailed instructions; (2) maintain attention and concentration for two-hour segments; (3) perform activities within a schedule, maintain regular attendance and be punctual within customary tolerance; (4) sustain an ordinary routine without special supervision; (5) work in coordination with or proximity to others without being distracted by them; (6) complete a normal workday and workweek without interruptions from psychological symptoms and perform at a consistent pace without unreasonably long or numerous rest periods; (7) interact appropriately with the general public; (8) accept instructions and respond appropriately to criticism from supervisors; (9) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (10) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; (11) respond appropriately to changes in the workplace; and, (12) set realistic goals or make plans independently of others.  (AR 1407-08.)

Dr. Padilla further found Mr. Garcia to be moderately limited in the ability to "[a]sk simple questions or request assistance."  (AR 1408.)  He also assessed Mr. Garcia to be slightly limited in the abilities to:  (1) remember locations and work-like procedures; (2) understand, remember, and carry out very short and simple instructions; (3) make simple work-related decisions; (4) be aware of normal hazards and take adequate precautions; and, (5) travel in unfamiliar places or use public transportation.  (AR 1407-08.)

In his 2019 narrative report, Dr. Padilla restated his opinions regarding Mr. Garcia's impairments by category as follows:

> Mr. Garcia's ability to understand and remember basic instructions is mildly impaired; . . . his ability to understand and remember more complex, multistep instructions is moderately impaired; . . . his ability to concentrate and persist at tasks of basic work is markedly impaired; . . . his ability to interact with the general public, coworkers and supervisors is markedly impaired; and . . . his ability to adapt to changes in the workplace is markedly impaired.

(AR 1405.)

## IV. The ALJ's Decision

In the April 22, 2019 decision currently under review, ALJ Farris found at step one of the sequential evaluation process that Mr. Garcia has not engaged in any substantial gainful activity since his alleged onset date of December 9, 2013.  (AR 1109.)  At step two, the ALJ found that Mr. Garcia has the severe impairments of mood disorder, anxiety disorder, and PTSD.  (AR 1109.)  She further found that Mr. Garcia's history of alcohol, cocaine, and methamphetamine abuse in remission, healed fracture, and successfully treated hepatitis C, as well as his cirrhosis and mild hearing loss, are non-severe considered separately or in combination with his other impairments.  (AR 1109.)  At step three, the ALJ found that the severity of Mr. Garcia's impairments, considered singly or in combination, does not meet or medically equal the criteria of any listings.  (AR 1109-10.)   In this regard, the ALJ found Mr. Garcia to be:   (a) mildly limited in understanding, remembering, or applying information and in concentrating, persisting, or maintaining pace; (b) moderately limited in adapting or managing oneself; and, (c) markedly limited in interacting with others.  (AR 1110.)

> At step four, ALJ Farris found Mr. Garcia to have the RFC
>
> to perform a full range of work at all exertional levels but with the following nonexertional limitations:  no more than moderate noise level; can make simple work related decisions with few workplace changes; no interaction with the general public; can have occasional and superficial interaction with coworkers; can have limited interaction with supervisors; cannot work at a production rate pace or perform tandem tasks.

(AR 1111.)

The ALJ found that Mr. Garcia's medically determinable impairments might be expected to cause some of his alleged symptoms, but that his statements concerning the intensity, persistence, and limiting effects of these symptoms were "not entirely consistent with the medical evidence and other evidence in the record." (AR 1112.) ALJ Farris noted that, according to the medical record evidence, Mr. Garcia's "symptoms improved with medical cannabis and therapy." (AR 1113.) She also noted that he "engages in a wide range of daily activities that suggests the ability to perform work activities" within the scope of his RFC, including driving himself to appointments, using a computer and the Internet, working on music and practicing bass guitar, working out, meditating, and rehearsing and performing with a band. (AR 1114.) She further noted that he told Dr. Horstmann he worked for a temp agency in construction from about 2007 to 2010 and, though he "did not get along with people," the agency would send him out to jobs where he worked alone and he was able to "be professional and provide services." (AR 1114.)

ALJ Farris also discussed the opinion evidence in the record in relation to Mr. Garcia's RFC. (AR 1114-17.) She gave significant weight to Dr. Hughson's opinions as consistent with her "interview and testing" and the medical record.[12] (AR 1115.) The ALJ also gave significant weight to the opinions of Drs. Lev and Smith, though she took "into consideration [Mr. Garcia's] testimony and new medical evidence in finding a greater degree of functional limitation." (AR 1115.) She gave limited weight to Dr. Horstmann's opinions because Dr. Horstmann only saw Mr. Garcia once and, though her "opinion indicates that [Mr. Garcia's] PTSD affected many areas of functioning," she "did not provide a function-by-function assessment of [his] abilities." (AR

---

[12] The ALJ did not explain the apparent inconsistency between her step-three finding that Mr. Garcia "has a marked limitation" in "interacting with others" and her step-four assignment of "significant" weight to Dr. Hughson's opinion that he is only "[m]oderate[ly]" limited in this domain. (AR 1110, 1115.) However, Mr. Garcia did not raise this as a claim of error and so the Court does not rely on it in granting Mr. Garcia's Motion. (*See generally* Docs. 17, 24.)

1116.)  She further determined that "Dr. Horstmann's clinical findings do not support the degree of symptoms and limitations [Mr. Garcia] alleged during his interview with her," and that her findings "do not support functional limitations beyond those set out" in the RFC.  (AR 1116.)

Finally, ALJ Farris gave little weight to Dr. Padilla's opinions, for several reasons.  (AR 1117.)  First, she noted that his opinions regarding Mr. Garcia's abilities to understand, remember, concentrate, and persist are inconsistent with Mr. Garcia's MMSE and WAIS-IV results.  (AR 1117.)  Second, she found Dr. Padilla's opinions regarding these abilities to be inconsistent with Mr. Garcia's testimony regarding his regular computer use and musical activities.  (AR 1117.)  Third, she observed that Dr. Padilla's opinions regarding Mr. Garcia's ability to interact with others did "not mean [Mr. Garcia] has no ability to interact with others" in light of his cooperation with evaluators, regular rehearsals with bandmates, and periodic public performances.  (AR 1117.)  Finally, the ALJ noted that Dr. Padilla's opinions are inconsistent with those of Drs. Hughson and Horstmann.  (AR 1117.)  ALJ Farris also rejected Mr. Garcia's wife's statements and testimony, based on inconsistency with medical record evidence and Mr. Garcia's demeanor at hearings.  (AR 1117-18.)

The ALJ summarized that she was including several restrictions in Mr. Garcia's RFC due to his anxiety, depression, and PTSD.  (AR 1118.)  "However, his continued participation in various bands and ability to read for hours on the internet, concentrate on war games, and play guitar for hours support a finding that he could perform work within the assigned [RFC]."  (AR 1118.)  Also at step four, the ALJ found that Mr. Garcia had no past relevant work.  (AR 1118.)

Finally, at step five, the ALJ found that, considering his age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Mr. Garcia

can perform, such as escort vehicle driver,[13] merchandise marker, and industrial cleaner.  (AR 1118-19.)

## V.  <u>Discussion</u>

In his Motion, Mr. Garcia argues that ALJ Farris committed reversible error by improperly rejecting Dr. Padilla's opinions.[14]  (Doc. 17 at 14-20.) The Commissioner responds that substantial evidence supports the ALJ's RFC and the ALJ reasonably weighed Dr. Padilla's opinions. (Doc. 21 at 8-24.)  For the first time in his reply, Mr. Garcia argues that the ALJ also erred in rejecting Dr. Horstmann's opinion.  (Doc. 24 at 8-11.)  As explained below, the Court finds that the ALJ erred by failing to provide an adequate reason for rejecting Dr. Padilla's opinions regarding Mr. Garcia's abilities to interact with others and adapt to workplace changes, and that this error was not harmless.  As such, the Court will not reach Mr. Garcia's other claim of error and will remand this matter to the Commissioner for further proceedings.

"[W]hen assessing a plaintiff's RFC, an ALJ must explain what weight is assigned to each [medical source] opinion and why."  *Silva v. Colvin*, 203 F. Supp. 3d 1153, 1157 (D.N.M. 2016). In considering medical opinions, the ALJ should generally accord more weight to the opinion of a source who has examined the claimant than to the opinion of a source who has rendered an opinion

---

[13] In finding that Mr. Garcia can perform the job of escort vehicle driver, the ALJ did not discuss the uncontroverted record evidence indicating that Mr. Garcia has significant problems driving, including:  (a) Dr. Hughson's notation that he "[a]voids driving on the freeway because of road rage leading to homicidal thoughts," (AR 303); (b) Dr. Horstmann's notations that he "takes back roads, stays off freeway, gets tense, gets angry, hypervigilant, anxiety/panic . . . stuck in fear mode" while driving, "doesn't follow other drivers," and "has had a few road rage incidents," (AR 1340); and, (c) Dr. Padilla's notations that he "will sometimes fantasize about how he would use his Marine Corps training to murder rude people, like individuals who cut him off in traffic," and that he is "highly anxious while driving, because many people are poor drivers who anger him and put him and other drivers at risk because he struggles to remain focused on the task at hand—getting somewhere without getting injured in a car accident or assaulting someone." (AR 1386.)  Again, however, Mr. Garcia did not raise this as a claim of error and so the Court does not rely on it in granting Mr. Garcia's Motion.  (*See generally* Docs. 17, 24.)

[14] In his Motion, Mr. Garcia also argued that the ALJ committed reversible error by failing to include a function-by-function assessment of his mental impairments.  (Doc. 17 at 20-23.)  However, because Mr. Garcia conceded this argument in his reply, the Court will not consider it.  (Doc. 24 at 11.)

based on a review of medical records alone. *See* 20 C.F.R. § 416.927(c)(1)[15]; *Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012) ("[A]n examining medical-source opinion is . . . given particular consideration: it is presumptively entitled to more weight than a doctor's opinion derived from a review of the medical record."); *cf. Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004) ("The opinion of an examining physician is generally entitled to less weight than that of a treating physician, and the opinion of an agency physician who has never seen the claimant is entitled to the least weight of all."). "If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8P, 1996 WL 374184, at *7 (July 2, 1996).

Medical opinions must be weighed using the factors set forth in 20 C.F.R. § 416.927(c), *i.e.*: (1) examining relationship, (2) treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors. "Not every factor for weighing opinion evidence will apply in every case," SSR 06-03P, 2006 WL 2329939, at *5, and the ALJ is not required to "apply expressly each of the six relevant factors in deciding what weight to give a medical opinion." *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007). Rather, what is required is that the ALJ provide good reasons for the weight she gives an opinion and that her explanation is sufficiently specific to make it clear to any subsequent reviewers the weight given to the opinion and the reasons for that weight. *See id.*; *see also Givens v. Astrue*, 251 F. App'x 561, 568 (10th Cir. 2007) (ALJ must provide "adequate reasons" for rejecting significantly probative medical evidence concerning claimant's RFC); *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003) (ALJ's

---

[15] The SSA issued new regulations regarding the evaluation of medical source opinions for claims filed on or after March 27, 2017. *See* "Revisions to Rules Regarding the Evaluation of Medical Evidence," 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017); 20 C.F.R. §§ 416.927, 416.920c. However, because Mr. Garcia filed his claim for SSI in 2013, the previous regulations still apply to this matter.

decision must be sufficiently specific to make clear to subsequent reviewers the weight the adjudicator gave to medical opinions and the reasons for that weight). An ALJ's failure to provide adequate reasons why a medical opinion was rejected or assigned a particular weight and to demonstrate that she has applied the correct legal standards in evaluating the evidence constitutes reversible error. *See Reyes*, 845 F.2d at 244.

**A.     The ALJ erred in rejecting Dr. Padilla's opinions regarding Mr. Garcia's abilities to interact with others and adapt to workplace changes.**

Mr. Garcia argues that ALJ Farris did not provide adequate reasons for rejecting Dr. Padilla's opinions regarding Mr. Garcia's mental impairments.[16]  (Doc. 17 at 1-2, 14-20.)  The Commissioner disagrees and contends that the ALJ provided good reasons for her treatment of these opinions.  (Doc. 21 at 10-22.)  The Court will consider each of the reasons the ALJ provided for rejecting Dr. Padilla's opinions in turn.

**1.     Mr. Garcia's MMSE and WAIS-IV results**

As noted above, ALJ Farris first supported her rejection of Dr. Padilla's opinions by observing that his opinions regarding Mr. Garcia's abilities to understand, remember, concentrate, and persist are inconsistent with Mr. Garcia's MMSE and WAIS-IV results.  (AR 1117.)  In 2017, Dr. Padilla found Mr. Garcia's ability to understand and remember complex, multi-step instructions to be "mildly to moderately impaired," while in 2019 he found this ability to be "moderately impaired."  (AR 43-45, 1405, 1407-08.)  Also, in 2017, Dr. Padilla found Mr. Garcia's ability to concentrate and persist at basic work tasks to be "moderately impaired," while in 2019 he found this ability to be "markedly impaired."  (AR 43-45, 1405, 1407-08.)  However, in both

---

[16] Mr. Garcia also briefly contends that it is "unclear" whether the ALJ was rejecting Dr. Padilla's 2017 opinions or his 2019 opinions.  (Doc. 17 at 15.)  Though the ALJ could have been clearer on this point, a fair reading of her decision indicates that she was rejecting both the 2017 and the 2019 opinions.  (*See* AR 1117 (discussing Dr. Padilla's opinions from both years before assigning them little weight).)

2017 and 2019, Mr. Garcia's results on the MMSE showed "normal cognitive functioning."  (AR 40, 1399.)  Also, his results on the WAIS-IV showed a full-scale IQ in the average range, "[v]erbal [c]omprehension" in the high average range, and "[w]orking [m]emory," *i.e.*, an "ability to sustain attention, concentrate, and exert mental control," in the average range.  (AR 41-42, 1401-03.)  Thus, substantial evidence supports the ALJ's conclusion that Dr. Padilla's opinions regarding Mr. Garcia's abilities to understand, remember, concentrate, and persist are objectively inconsistent with Mr. Garcia's MMSE and WAIS-IV results, and thus supports her rejection of these opinions.[17] *See Pisciotta v. Astrue*, 500 F.3d 1074, 1078 (10th Cir. 2007) ("Medical evidence may be discounted if it is internally inconsistent or inconsistent with other evidence.").

However, the MMSE and WAIS-IV do not purport to measure or provide any other information regarding Mr. Garcia's ability to interact with others or his ability to adapt to changes in the workplace, which abilities Dr. Padilla found to be markedly limited.[18] (AR 1392, 1408.)  Mr. Garcia's MMSE and WAIS-IV results provide no reason for the ALJ to reject these opinions. Moreover, Dr. Padilla's other clinical findings support them, including:  (1) Mr. Garcia's results on the PLC-C and BDI-II; and, (2) Dr. Padilla's "other mental status findings" of impaired

---

[17] The Court notes that, in his 2019 narrative report, Dr. Padilla added a caveat to his opinion regarding Mr. Garcia's impaired ability to concentrate, observing that "*[w]hen he feels irritable, which is almost all the time,* he has major difficulty focusing his attention." (AR 1386, 1391 (emphasis added).)  It is of course possible that Mr. Garcia did not feel irritable during Dr. Padilla's testing and was therefore able to concentrate for those limited periods of time but is still markedly limited in this ability "almost all the time." (*Id.*)  However, the ALJ was not required to entertain this possibility, which fails to overwhelm the substantial evidence supporting her determination that Mr. Garcia's test results are inconsistent with Dr. Padilla's opinions regarding his abilities to understand, remember, concentrate, and persist. *Langley,* 373 F.3d at 1118.

[18] More specifically, in both 2017 and 2019, Dr. Padilla found Mr. Garcia to be markedly limited in the abilities to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  (AR 44-45, 1407-08.)  In both years, he also found Mr. Garcia to be markedly limited in his ability to respond appropriately to workplace changes.  (AR 45, 1408.)  In addition, in 2017, he found Mr. Garcia to be moderately limited in the abilities to maintain socially appropriate behavior and set realistic goals or make plans independently of others, while in 2019, he found Mr. Garcia to be markedly limited in these abilities.  (AR 45, 1408.)  Finally, in 2019, he found Mr. Garcia to be moderately limited in the abilities to ask simple questions or request assistance and adhere to basic standards of neatness and cleanliness.  (AR 1408.)

judgment, insight, and decision-making, dysphoric mood and affect, pressured speech, intrusive thought content, and preoccupations.  (Doc. 17 at 16; AR 38, 40, 1386-88.)

Other material in Dr. Padilla's reports likewise supports his opinions that Mr. Garcia is markedly impaired in the abilities to interact with others and adapt to workplace changes, including:  (1) Dr. Padilla's notation of Mr. Garcia's reports of social withdrawal, ambivalence toward treatment, homicidal and suicidal ideation, anger, irritability, inattention, nightmares, poor sleep, intrusive thoughts, and problems with authority; and, (2) Dr. Padilla's treatment recommendations, including his recommendation that Mr. Garcia seek in-patient treatment at the VA.  (Doc. 24 at 3 & n.3; AR 38-43, 1385-92.)  The Court therefore finds that the ALJ's first reason for rejecting Dr. Padilla's opinions, while adequate with respect to his opinions regarding Mr. Garcia's abilities to understand, remember, concentrate, and persist, does not address and is not adequate with respect to his opinions regarding Mr. Garcia's abilities to interact with others and adapt to changes in the workplace.

### 2.    Mr. Garcia's usual activities

The ALJ next supported her rejection of Dr. Padilla's opinions by observing that his opinions regarding Mr. Garcia's abilities to understand, remember, concentrate, and persist are inconsistent with Mr. Garcia's testimony regarding his usual activities.  (AR 1117.)  At the February 2019 hearing before ALJ Farris, Mr. Garcia testified that he has a computer and uses it to stream YouTube and music videos, contact family members, and access the news.[19]  (AR 1133-36.)  Mr. Garcia further testified that he:  (1) "work[s] up music" and practices bass guitar for "sometimes four or five hours," (AR 1134); (2) spends two to three hours practicing on a typical

---

[19] At the September 2016 hearing, Mr. Garcia testified that he uses his computer to access the Internet for conspiracy theories and to play war scenario games.  (AR 56.)

day, (AR 1136); and, (3) rehearses and performs with a band.  (AR 1134-35, 1143.)  Substantial evidence supports the ALJ's conclusion that these activities are inconsistent with Dr. Padilla's opinions that Mr. Garcia is moderately impaired in his ability to understand and remember complex, multi-step instructions and markedly impaired in his ability to concentrate on and persist at basic work tasks.

Mr. Garcia contends that this is an inadequate reason for the ALJ to reject Dr. Padilla's opinions because:  (1) the ALJ improperly relied on Mr. Garcia's "sporadic" performance of daily activities, citing *Thompson v. Sullivan*, 987 F.2d 1482, 1490 (10th Cir. 1993); (2) Mr. Garcia spends the majority of his time avoiding social contact; (3) the ALJ's account of Mr. Garcia's daily activities is incomplete, citing *Gomez v. Berryhill*, No. CV 17-155 KK, 2018 WL 2973400, at *10 (D.N.M. June 13, 2018); and, (4) the activities on which the ALJ relied are coping strategies for Mr. Garcia and do not demonstrate an ability to work.  (Doc. 17 at 16-17; Doc. 24 at 4-6.)

Regarding Mr. Garcia's first argument, with the exception of band performances, none of the activities on which the ALJ relied can be considered "sporadic," *i.e.*, "occurring occasionally, singly, or in irregular or random instances."   https://www.merriam-webster.com/dictionary/sporadic (last visited June 5, 2020).  As noted above, Mr. Garcia testified that he practices guitar from two to five hours daily.  In addition, he told Dr. Horstmann that his "usual day" includes yard work, Internet use, video games, and practicing bass guitar.  (AR 1337.) He also told Dr. Padilla that he "typically" spends "much of his day" at the computer and rehearses with friends "once a week."   (AR 1387.)  In short, substantial evidence supports the ALJ's determination that Mr. Garcia engages in computer use and musical practice and rehearsal regularly, and not sporadically as Mr. Garcia maintains.

Mr. Garcia's second argument, *i.e.*, that the record shows he spends the majority of his time avoiding social contact and distracting himself from disturbing thoughts, is likewise unavailing with respect to his abilities to understand, remember, concentrate, and persist. This argument does not address or alter the substantial evidence supporting the ALJ's determination that his usual activities demonstrate abilities to understand, remember, concentrate, and persist that are inconsistent with Dr. Padilla's opinions regarding these abilities. Notably, however, the uncontroverted record evidence that he spends the majority of his time avoiding social contact and distracting himself from disturbing thoughts *is* relevant to, and supportive of, Dr. Padilla's opinions regarding his markedly limited abilities to interact with others and adapt to workplace changes.

Mr. Garcia's third argument, that the ALJ's account of his daily activities is incomplete, is incorrect. The ALJ's decision includes a thorough description of Mr. Garcia's most recent testimony regarding his daily activities. (AR 1111-12.) The ALJ was not required to repeat this description *in toto* in explaining her rejection of Dr. Padilla's opinions, particularly where the omitted testimony is irrelevant to her explanation. And finally, Mr. Garcia's description of his usual activities as "coping strategies" does not change the record evidence that these activities are inconsistent with a moderately impaired ability to understand and remember and a markedly impaired ability to concentrate and persist. As such, none of the reasons Mr. Garcia has proffered undermine the ALJ's determination that his regular activities are inconsistent with Dr. Padilla's opinions that he is significantly limited in the abilities to understand, remember, concentrate, and persist.

However, as the ALJ tacitly recognized, Mr. Garcia's usual activities do *not* support her rejection of Dr. Padilla's opinions regarding his abilities to interact with others and adapt to

workplace changes.  That Mr. Garcia uses a computer and practices guitar daily, rehearses with a

band once a week, and performs with the band six to eight times per year is simply insufficient to

contradict Dr. Padilla's opinions that Mr. Garcia is markedly limited in these abilities.  In this

regard, it is important to note that, according to Dr. Padilla, a "[m]arked" limitation

> precludes the individual's ability usefully to perform the designated activity *on a*
> *regular and sustained basis, i.e., 8 hours a day, 5 days a week, or an equivalent*
> *schedule*.  The individual cannot be expected to function independently,
> appropriately, and effectively on a regular and sustained basis.

(AR 44-45; AR 1407-08 (emphasis altered).)  Mr. Garcia's once-a-week rehearsals with other band

members and six- to eight-times-a-year public performances fall well short of showing that Mr.

Garcia can usefully interact with coworkers and the public 8 hours a day, 5 days a week or on an

equivalent schedule, and thus do not contradict Dr. Padilla's opinions that he is unable do so.

Further, none of Mr. Garcia's regular activities demonstrate any ability to interact with supervisors

or adapt to workplace changes, much less an ability to do so on a regular, sustained basis.  The

Court therefore finds that the ALJ's second reason for rejecting Dr. Padilla's opinions, like her

first, is adequate with respect to his opinions regarding Mr. Garcia's abilities to understand,

remember, concentrate, and persist, but does not address and is not adequate with respect to his

opinions regarding Mr. Garcia's abilities to interact with others and adapt to workplace changes.

> **3.      Mr. Garcia's interactions with others**

The ALJ next made the following observation in rejecting Dr. Padilla's opinions:

> Dr. Padilla also opined [that Mr. Garcia's] ability to interact with the public,
> coworkers, and supervisors was markedly impaired, but this does not mean [that
> Mr. Garcia] has no ability to interact with others.

(AR 1117.)   In support of this observation, the ALJ pointed to Mr. Garcia's "consistently cooperative and calm" demeanor with medical providers,[20] weekly rehearsals, and occasional public performances.  (AR 1117.)  Mr. Garcia argues that this reason for rejecting Dr. Padilla's opinions is improper and "confusingly vague" because Dr. Padilla did not opine that Mr. Garcia could never interact with others.  (Doc. 17 at 18-19.)

In and of itself, the ALJ's observation that Mr. Garcia retains some ability to interact with others is supported by substantial evidence.  (*See* AR 1110, 1117.)  However, the Court agrees that this observation does not constitute an adequate reason to reject Dr. Padilla's opinions that Mr. Garcia has marked social limitations.  As Mr. Garcia observes, Dr. Padilla did not opine that Mr. Garcia is completely unable to interact with others.   Rather, he opined that Mr. Garcia had "[m]arked" limitations in his abilities to interact with the general public, coworkers, and supervisors.  (AR 44-45; AR 1407-08.)   Again, a marked limitation is one that "precludes the individual's ability usefully to perform the designated activity on a regular and sustained basis, *i.e.*, 8 hours a day, 5 days a week, or an equivalent schedule."  (AR 44-45; AR 1407-08 (emphasis omitted).)   And again, Mr. Garcia's calm, cooperative demeanor with some providers, once-a-week rehearsals, and occasional performances fall well short of demonstrating an ability to usefully interact with supervisors, coworkers, and/or the public 8 hours a day, 5 days a week or on

---

[20] Mr. Garcia argues that the ALJ's reference to his calm, cooperative demeanor with providers is a "post-hoc rationalization that must be disregarded," because the ALJ failed to include record citations on this point.  (Doc. 24 at 7 (citing *Haga v. Astrue*, 482 F.3d 1205, 1207-08 (10th Cir. 2007).)  However, the Commissioner's post-hoc provision of record citations is not a "post-hoc rationalization," *i.e.*, an explanation to support the ALJ's decision that is not apparent from the ALJ's decision itself.  *Haga*, 482 F.3d at 1207-08.  Moreover, in other places in her decision, the ALJ did include record citations to providers' observations that Mr. Garcia was cooperative, calm, or euthymic.  (AR 1113-14, 1116.)  Mr. Garcia points out that he was "irritated" with Dr. Hughson and "anxious" with Dr. Horstmann, which does tend to undermine the ALJ's assertion that he was "*consistently* cooperative *and calm* with medical providers."  (Doc. 24 at 7 n.5; AR 1117 (emphases added); *see* AR 302, 304, 1347.)  However, this does not negate the substantial record evidence that Mr. Garcia was cooperative and calm with some providers and thus retains some ability to interact with others.

an equivalent schedule.  Thus, the ALJ's third reason for rejecting Dr. Padilla's opinions is not adequate.

### 4.     The opinions of Drs. Hughson and Horstmann

Finally, the ALJ rejected Dr. Padilla's opinions because they are inconsistent with those of Drs. Hughson and Horstmann.  (AR 1117.)  While Dr. Hughson found Mr. Garcia to be only mildly limited in the abilities to understand, remember, concentrate, and persist, Dr. Padilla found him to be moderately to markedly limited in these domains.  (AR 43-45, 300, 1405, 1407-08.)  And, while Dr. Hughson found Mr. Garcia to be only moderately limited in the abilities to interact with others and adapt to workplace changes, Dr. Padilla found him to be markedly limited in these areas.  (AR 43-35, 300, 1405, 1407-08.)  Dr. Horstmann, in turn, opined that Mr. Garcia's symptom severity was moderate, while Dr. Padilla found Mr. Garcia to be markedly impaired in many respects.  (AR 43-35, 1332, 1405, 1407-08.)  Thus, substantial evidence supports the ALJ's determination that Dr. Padilla's opinions are inconsistent with those of Dr. Hughson; and, some of Dr. Padilla's opinions may also be inconsistent with those of Dr. Horstmann, though, as further discussed below, the record includes insufficient information to determine which ones.

Mr. Garcia argues that this is an inadequate reason to reject Dr. Padilla's opinions because: (1) Dr. Padilla supported his opinions better than Dr. Hughson did; (2) Dr. Padilla has more experience than Dr. Hughson in evaluating veterans; and, (3) the ALJ could not properly give Dr. Horstmann's opinion limited weight and then use it to reject Dr. Padilla's opinions.  (Doc. 17 at 19-20.)  The Court will address each of these arguments in turn.

### a.     Relative supportability and consistency of the opinions of Drs. Padilla and Hughson

Mr. Garcia first argues that the ALJ erred in crediting the opinions of Dr. Hughson over those of Dr. Padilla, because Dr. Padilla reviewed more records and gave Mr. Garcia more tests

and his opinions are therefore more supportable. (Doc. 17 at 19.) Mr. Garcia is correct that one factor an ALJ should consider in weighing medical source opinions is "[s]upportability. The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion." 20 C.F.R. § 416.927(c)(3). Relatedly, an ALJ should also consider "[c]onsistency. Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion." 20 C.F.R. § 416.927(c)(4).

Here, Mr. Garcia correctly observes that Dr. Padilla reviewed more of Mr. Garcia's medical and mental health records than Dr. Hughson did, and administered more tests to Mr. Garcia. (*Compare* AR 36-43 *and* AR 1394-1405 *with* AR 302-06.) Dr. Padilla reviewed a number of Mr. Garcia's medical and mental health records, including records from Presbyterian Health Care Services, Dr. Hughson, Dr. Kuny, Mr. Krumm, Dr. Levensky, Mr. Godwin, Ms. Labash and Dr. Hearne. (AR 36, 1394-95.) He also administered several tests, including the MMSE, the PCL-C, the BDI-II, the WAIS-IV, and a mental status examination. (AR 36, 1394.) In contrast, Dr. Hughson reviewed only one record—Mr. Krumm's March 2014 note—and administered no tests except for a mental status examination. (AR 302-06.)

Moreover, the contents of Dr. Padilla's reports—including the results of the tests he administered—and the medical records he reviewed are consistent with his opinions that Mr. Garcia is markedly impaired in the abilities to interact with others and adapt to workplace changes.[21] In his report, Dr. Padilla noted that Mr. Garcia: (a) is easily angered; (b) fantasizes about how he would kill "rude people"; (c) has suicidal thoughts, PCL-C scores consistent with PTSD, and BDI-II scores consistent with severe major depression; (d) prefers solitary activities;

---

[21] As discussed above, however, the results of the MMSE and WAIS-IV that Dr. Padilla administered to Mr. Garcia are not consistent with his opinions regarding Mr. Garcia's abilities to understand, remember, concentrate, and persist.

(e) presented with impaired judgment, insight, and decision-making, dysphoric mood, intrusive thought content, and preoccupation with "problems with authority"; (f) is highly anxious while driving; and, (g) "to avoid potential conflict . . . stays home almost all of the time."  (AR 38-43, 1385-92.)   Dr. Padilla was cognizant of Mr. Garcia's interactions with his band, but also ascertained and noted the limited frequency of these interactions.  (AR 39, 1387.)  Also, he expressly noted that, when Mr. Garcia was seriously injured falling from a roof, "his psychiatric symptoms worsened to the point that he was unable to engage in gainful employment, or even part-time work."  (AR 1392.)

Notwithstanding the Commissioner's arguments to the contrary, (Doc. 21 at 18-19), the provider records Dr. Padilla reviewed are likewise broadly consistent with and supportive of his opinions regarding Mr. Garcia's impaired abilities to interact with others and adapt to workplace changes, particularly given the lengthy span of time—2010 to 2019—these records cover.  Of particular note, the medical records from Presbyterian confirm Mr. Garcia's reports regarding his injuries from the roof fall; and, those mental health care providers who included a diagnosis in their records invariably diagnosed Mr. Garcia with PTSD.  Also, Dr. Kuny, like Dr. Padilla, diagnosed Mr. Garcia with recurrent major depressive disorder.[22]

In contrast, as previously noted, Dr. Hughson's opinions are but thinly supported by clinical findings and records review.  Moreover, the contents of her narrative report appear inconsistent with her opinions that Mr. Garcia is only moderately limited in his abilities to interact with others and adapt to workplace changes.  In her report, Dr. Hughson recorded that Mr. Garcia

---

[22] Dr. Kuny's "[d]iagnostic [i]mpression" was of "moderate" major depressive disorder, while Dr. Padilla's diagnosis was of "[s]evere" major depressive disorder.  (AR 43, 905, 1390.)  However, Dr. Kuny noted, in 2014, that Mr. Garcia's hypervigilance and isolation were "increasing," (AR 905-06); and, Dr. Padilla saw Mr. Garcia in 2017 and 2019.  (AR 36, 1382.)  Also, Dr. Kuny does not appear to have administered any diagnostic tests to Mr. Garcia to assess his depression, while Dr. Padilla administered the BDI-II.  (AR 36, 904-06, 1382.)  As such, the two diagnoses are not necessarily inconsistent and, to the extent they are, Dr. Padilla's is better supported.

is angry all the time, sometimes paranoid, anxious and hypervigilant around police and gang members, and generally hypervigilant in crowds, mostly stays home, and has road rage, a "big problem with authority," and "[n]ot infrequent" homicidal ideation, to the point of strategizing how he would kill people.  (AR 303, 305.)

Moreover, her report lacks any information indicating that Mr. Garcia's abilities to interact with others and adapt to workplace changes are, notwithstanding the foregoing, only moderately impaired.  She did note that he "[p]lays in a band," but did not discuss any details about how often or for how long.  (AR 304.)  Likewise, she noted that he "[g]ot along well with coworkers" before he fell from a roof; however, she also listed the fall as a "significant trauma[]" and observed that, since that time, Mr. Garcia is sometimes paranoid and his "[p]resentation is significant for his inability to resume functioning."  (AR 303-05.)  However, she failed to address whether this trauma aggravated Mr. Garcia's prior mental impairments, including his social limitations and inflexibility.

In sum, Dr. Padilla's opinions regarding Mr. Garcia's abilities to interact with others and adapt to workplace changes are more consistent with and better supported by his reports, clinical findings, and records reviews than those of Dr. Hughson.  Nevertheless, the ALJ failed to discuss the relative supportability and consistency of these opinions.  Thus, the ALJ's reliance on Dr. Hughson's opinions to reject those of Dr. Padilla is not supported by substantial evidence and fails to demonstrate that she applied the correct legal standards, including 20 C.F.R. § 416.927(c)(3) and (c)(4), in evaluating the evidence.  *Oldham*, 509 F.3d at 1258; *Watkins*, 350 F.3d at 1300; *Reyes*, 845 F.2d at 244.  The ALJ therefore erred in relying on Dr. Hughson's opinions to reject Dr. Padilla's opinions on these points.

        **b.**        **Relative experience of Drs. Padilla and Hughson in evaluating veterans**

34

Mr. Garcia next argues that the ALJ should have credited Dr. Padilla over Dr. Hughson because Dr. Padilla "has conducted hundreds of Compensation and Pension evaluations for veterans" while "Dr. Hughson's report does *not* indicate she has any experience with evaluating veterans." (Doc. 17 at 19 (emphasis in original).)

Mr. Garcia is correct that specialization is another factor the ALJ should consider in weighing medical opinions.  20 C.F.R. § 416.927(c)(5).  He is also correct that Dr. Padilla documented his considerable previous experience evaluating veterans, while the record fails to indicate that Dr. Hughson had any specialized experience in this area when she evaluated Mr. Garcia.  (AR 43, 302-06, 1391.)  Moreover, it is true that Dr. Horstmann, who conducted Mr. Garcia's Compensation and Pension evaluation for the VA HCS, necessarily had specialized experience evaluating veterans as well; however, as discussed below, the ALJ accorded Dr. Horstmann's opinions limited weight for reasons that undermine her reliance on them to reject the opinions of Dr. Padilla.

Nevertheless, the ALJ failed to discuss specialization in relying on the opinions of Drs. Hughson and Horstmann to reject those of Dr. Padilla.  For this reason as well, the ALJ's decision to credit the opinions of Drs. Hughson and Horstmann over those of Dr. Padilla is not supported by substantial evidence and fails to demonstrate that the ALJ applied the correct legal standards, including 20 C.F.R. § 416.927(c)(5), in evaluating the evidence.  *Oldham*, 509 F.3d at 1258; *Watkins*, 350 F.3d at 1300; *Reyes*, 845 F.2d at 244.

   c. **The ALJ's reliance on Dr. Horstmann's opinions to reject Dr. Padilla's opinions despite assigning the former limited weight**

Finally, Mr. Garcia argues that the ALJ could not properly rely on Dr. Horstmann's opinion to reject Dr. Padilla's opinions because the ALJ "improperly characterized [Dr. Horstmann's] findings as 'moderate,' when in fact, Dr. Horstmann found Mr. Garcia's PTSD severe," and also

because the ALJ had already "rejected" Dr. Horstmann's opinions.   (Doc. 17 at 20 (emphases

omitted).)   Regarding the first point, Mr. Garcia is mistaken.   As the Commissioner observes,

though Dr. Horstmann recorded that Mr. Garcia reported severe symptoms on the PCL-5, she also

stated that his "[s]ymptom severity is considered moderate."   (Doc. 21 at 20; AR 1332, 1347-48.)

However, regarding Mr. Garcia's second point, Mr. Garcia is correct that one of the ALJ's

reasons for assigning Dr. Horstmann's opinions limited weight undermines her reliance on those

opinions to reject Dr. Padilla's opinions.[23]   (AR 1116.)   A fair reading of the ALJ's decision

indicates that the ALJ credited Dr. Horstmann's clinical findings and assessment of Mr. Garcia's

symptom severity as moderate, discredited the degree of severity of symptoms Mr. Garcia reported

during her clinical interview, and did not use Dr. Horstmann's opinion that Mr. Garcia has

clinically significant functional impairments to develop Mr. Garcia's RFC because the opinion did

not include a "function-by-function assessment" of Mr. Garcia's abilities or limitations.   (AR

1115-16); *cf. Duncan v. Colvin*, 608 F. App'x 566, 574 (10th Cir. 2015) (where there were "no

---

[23] In *Chapo*, the Tenth Circuit found that the ALJ in that case "effectively reject[ed]" a medical source opinion to which he had nominally "accord[ed] little weight."   *See* 682 F.3d at 1290-91 (discussing "the ALJ's justification for effectively rejecting (or, as the ALJ put it, 'according little weight to') Dr. Vega's unopposed findings").   Courts in this circuit have sometimes interpreted this language to mean that, universally, "according a medical opinion 'little weight' is 'effectively rejecting' that opinion."   *Martinez v. Saul*, No. CIV 18-1196 KBM, 2019 WL 4346311, at *3 (D.N.M. Sept. 12, 2019); *Perea v. Berryhill*, No. CV 17-401 KK, 2018 WL 3405257, at *7 & n.24 (D.N.M. July 12, 2018); *see also, e.g.*, *Quintero v. Colvin*, 567 F. App'x 616, 620 n.6 (10th Cir. 2014) ("Although the ALJ actually stated she assigned the opinion 'little, if any weight' rather than outright rejecting it, we have recognized such statements operate as the equivalent of a rejection of the opinion."); *Sanchez v. Saul*, No. CV 18-1214 JHR, 2020 WL 1236607, at *4 n.6 (D.N.M. Mar. 13, 2020) ("The ALJ afforded 'little weight' to Dr. Hughson's opinions, thereby 'effectively rejecting' them under Tenth Circuit law."); *but see Dunn v. Colvin*, No. 14-CV-00759-KLM, 2015 WL 1756126, at *5 (D. Colo. Apr. 15, 2015) (declining to equate "little weight" with "rejection" notwithstanding *Chapo* where it was "patently clear that the ALJ did *not* fully reject Dr. Quintana's opinion but, rather, merely gave it little weight") (emphasis in original).   However, even assuming that *Chapo*'s equation of "*little*" weight" with "rejection" was intended to be universal, and not specific to the ALJ's actual treatment of the particular medical opinion at issue, the Court has found no controlling authority that universally equates "*limited* weight" with "rejection."   *Cf. Guice v. Comm'r, SSA*, 785 F. App'x 565, 568–69 (10th Cir. 2019) (ALJ who gave "limited weight" to treating physician opinions "but . . . did not incorporate any part of their opinions in [the plaintiff's] RFC . . . effectively rejected" the opinions); *but see Petti v. Colvin*, No. 15-CV-0256-WJM, 2016 WL 232775, at *3 (D. Colo. Jan. 20, 2016) (misciting *Chapo* to hold that "the language 'limited weight' indicates that an ALJ is effectively rejecting a medical opinion").   Thus, the Court cannot simply assume that the ALJ rejected Dr. Horstmann's opinions and must instead consider the ALJ's actual treatment of them.

medical opinions regarding [the claimant's] work-related functional limitations, there was no opinion on such matters . . . for the ALJ to weigh").

The ALJ was also reasonably clear that she was rejecting Dr. Padilla's opinions based on one of Dr. Horstmann's opinions that she credited, *i.e.*, that Mr. Garcia's PTSD "symptom severity" was "moderate." (AR 1117.) However, this opinion is too vague and general to support the ALJ's rejection of Dr. Padilla's opinions. As the ALJ herself pointed out, Dr. Horstmann's report "indicates that [Mr. Garcia's] PTSD affected many areas of functioning but does not specify what [Mr. Garcia] can still do" and does "not provide a function-by-function assessment of [Mr. Garcia's] abilities." (AR 1116); *see Bainbridge v. Colvin*, 618 F. App'x 384, 390 (10th Cir. 2015) (ALJ properly rejected one physician's opinion and afforded less than controlling weight to another in part because they were "not based on a function-by-function analysis of what [the claimant] is capable of doing despite his impairments and did not specify whether [the claimant] was unable to perform his past work or any substantial gainful activity at all") (quotation marks omitted); *see also, e.g., Montoya v. Colvin*, No. CV 16-116 GJF, 2016 WL 9113180, at *6 (D.N.M. Dec. 29, 2016) (that provider's opinion was "vague as to what amounts [the plaintiff] can carry, push and or pull" was "a good reason for discounting [the provider's] opinion") (quotation marks omitted).

In relying on it to reject Dr. Padilla's opinions, the ALJ appeared to assume that Dr. Horstmann's general opinion of moderate symptom severity applied equally to all of Mr. Garcia's symptoms. (AR 1117.) However, Dr. Horstmann's report does not support this assumption. In her report, Dr. Horstmann listed numerous PTSD symptoms that Mr. Garcia experiences, and her description of these symptoms, though generic, indicates that some are more severe than others. (AR 1344-47.) For example, she wrote that Mr. Garcia experiences "*clinically significant* distress

or impairment in social, occupational, or other important areas of functioning," but only "*[m]ild* memory loss." (AR 1346 (emphases added).) Also, she noted that Mr. Garcia reported "severe" symptoms on the PCL-5, but never discussed or explained the discrepancy between this result and her general assessment of "moderate" symptom severity. (AR 1332, 1348.) Thus, on the present record, it is impossible to tell whether Dr. Horstmann's vague and general opinion regarding moderate symptom severity actually contradicts any particular portion of Dr. Padilla's specific function-by-function assessment of Mr. Garcia's impairments. In these circumstances, the ALJ's reliance on Dr. Horstmann's opinions to reject those of Dr. Padilla is neither adequate nor supported by substantial evidence.

In sum, the Court finds that the reasons the ALJ provided for rejecting Dr. Padilla's opinions regarding Mr. Garcia's work-related mental impairments, though adequate with respect to his opinions regarding Mr. Garcia's abilities to understand, remember, concentrate, and persist, were not adequate with respect to his opinions regarding Mr. Garcia's abilities to interact with others and adapt to workplace changes. *Oldham*, 509 F.3d at 1258; *Watkins*, 350 F.3d at 1300. As such, the ALJ erred in rejecting Dr. Padilla's opinions that Mr. Garcia's abilities to interact with others and adapt to workplace changes are markedly impaired.

**B.     The ALJ's error was not harmless.**

The Tenth Circuit "appl[ies] harmless error analysis cautiously in the administrative review setting." *Fischer-Ross v. Barnhart*, 431 F.3d 729, 733 (10th Cir. 2005). Nevertheless, "harmless error analysis . . . may be appropriate to supply a missing dispositive finding" where a court can "confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way." *Id.* at 733-34 (quotation marks omitted). *Inter alia*, the failure to provide adequate reasons for the weight assigned to a medical opinion "involves

harmless error if there is no inconsistency between the opinion and the ALJ's assessment of [the claimant's RFC]." *Mays v. Colvin*, 739 F.3d 569, 578-79 (10th Cir. 2014) (citing *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162-63 (10th Cir. 2012)). In that situation, the claimant is not prejudiced "because giving greater weight to the opinion would not have helped her." *Id.* at 579 (quoting *Keyes-Zachary*, 695 F.3d at 1163) (brackets omitted).

Here, however, Dr. Padilla's opinions regarding Mr. Garcia's abilities to interact with others and adapt to workplace changes on the one hand, and the ALJ's assessment of Mr. Garcia's RFC on the other, are inconsistent.  As previously discussed, Dr. Padilla opined that Mr. Garcia's abilities to interact with supervisors, coworkers and the public and adapt to workplace changes are markedly impaired, and thus that Mr. Garcia is wholly precluded from usefully engaging in these activities on a regular and sustained basis.  (AR 44-45, 1407-08.)  Nevertheless, the ALJ found that Mr. Garcia has the RFC to perform a full range of work at all exertional levels with "few workplace changes," "no interaction with the general public," "occasional and superficial interaction with coworkers," and "limited interaction with supervisors."  (AR 1111.)

The Court recognizes that the RFC the ALJ assigned is consistent with Dr. Padilla's opinions regarding Mr. Garcia's ability to interact with the public and there is consequently no harm in her erroneous rejection of those opinions.  However, with respect to Mr. Garcia's abilities to interact with supervisors and coworkers and adapt to workplace changes, Dr. Padilla opined that Mr. Garcia is more severely impaired than the ALJ's RFC appears to accommodate.[24]  Had the ALJ properly weighed Dr. Padilla's opinions regarding these impairments, she may have given

---

[24] The ALJ's RFC appears to be more consistent with "[m]oderate" than "[m]arked" impairments as Dr. Padilla used those terms.  The forms Dr. Padilla completed define a "[m]oderate" limitation as one "that seriously interferes with the individual's ability to perform the designated activity on a regular and sustained basis, i.e., 8 hours a day, 5 days a week, or an equivalent schedule. *The individual may be able to perform this work-related mental function on a limited basis.*  However, the individual should not be placed in a job setting where this mental function is critical to job performance or job purpose."  (AR 44-45, 1407-08 (emphasis altered).)

them greater weight and thereby assigned Mr. Garcia a more restrictive RFC.  The Court therefore finds that the ALJ's failure to provide adequate reasons for rejecting Dr. Padilla's opinions regarding Mr. Garcia's abilities to interact with others and adapt to workplace changes was not harmless.

### C.      The Court does not reach Mr. Garcia's other claim of error.

Because the Court concludes that remand is required due to the ALJ's failure to provide adequate reasons for rejecting Dr. Padilla's opinions regarding Mr. Garcia's social limitations and adaptability, the Court will not address Mr. Garcia's other claim of error. *See Watkins*, 350 F.3d at 1299 (explaining that the reviewing court does not reach issues that may be affected on remand).

### VI.      Conclusion

For the foregoing reasons, the Court finds that the ALJ in this case failed to give adequate reasons for rejecting the opinions of examining psychologist Eligio Padilla, Ph.D., regarding Mr. Garcia's work-related mental impairments, and that this error was not harmless.  Mr. Garcia's Motion to Reverse and Remand for a Rehearing with Supporting Memorandum (Doc. 17) is therefore GRANTED, and this matter is remanded to the Commissioner for further proceedings consistent with this Memorandum Opinion and Order.

IT IS SO ORDERED.

_____
KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE
Presiding by Consent